**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| **DUNG NGUEN,**<br>**MYDUNG NGUYEN,**<br>**LINH NGUYEN**<br><br>  Plaintiffs.<br><br>v.<br><br>**COUNTRYSIDE POLICE DEPT.,**<br>**ANNA CUMBO,**<br>**SAM BECCARA,**<br>**ANGELA BECCARA**<br><br>  Defendants. | Case No: 2010 cv 00504<br><br>JURY DEMAND |

## COMPLAINT AT LAW

NOW COME Plaintiffs, DUNG NGUYEN, MYDUNG NGUYEN, and LINH NGUYEN, by and through their attorney, Justin London, complaining of Defendants COUNTRYSIDE POLICE DEPARTMENT, ANNA CUMBO, SAM BECCARA, and ANGELA BECCARA, and in support thereof, state:

### Parties

1.   Plaintiff  DUNG NGUYEN ("DANNY"), MYDUNG NGUYEN ("MYDUNG"), and LINH NGUYEN ("LINH") are individuals, and collectively a family ("NGUYENS"), residing in Countryside, Illinois.

2.    Defendant    COUNTRYSIDE    UNIVERSITY    POLICE    DEPARTMENT ("COUNTRYSIDE") is a municipal police agency in Countryside, Illinois.

3.  Defendant ANNA CUMBO ("CUMBO") is an individual residing in Countryside,

Illinois.

4. Defendant SAM BECCARA is the son-in-law of CUMBO and based on information and belief, resides in Countryside, Illinois.

5. Defendant ANGELA BECCARA is the daughter of CUMBO and SAM BECCARA's wife and based on information and belief, resides in Countryside, Illinois.

**Jurisdiction and Venue**

6.    The Court has subject matter jurisdiction under federal question jurisdiction pursuant to 28 U.S.C § 1331.

7.  The Court has supplemental jurisdiction over other claims pursuant to 28 U.S.C. 1367(a).    Venue is proper pursuant to 28 U.S.C. §1391(b).

**Common Allegations**

8.  The NGUYENS are Vietnamese immigrants.  DANNY,  along with his sisters, MYDUNG AND LINH, own and operate Lee Nails,  a nail salon in Countryside, Illinois.

9.  CUMBO is a landlord who owns a strip mall and a local diner in the mall called Little Joe's located at 20 E. Plainfield Road in Countryside, Illinois.

10.  Numerous officers in the COUNTRYSIDE POLICE DEPARTMENT eat at Little Joe's and based on information and belief, receive free food and/or are friends with CUMBO and the BECCARAS.

11. On March 17, 2005, Lee Nails entered into a five-year commercial lease ("Lease") with CUMBO to be a tenant and rent space at 26. E. Plainfield Road, commencing April 5, 2005 and terminating on April 1, 2010.  A copy of the lease is attached herein as **Exhibit A**.

12. As part of the terms of the Lease, the sewer and water bills are paid by the Lessor. Nonetheless, CUMBO repeatedly asked DANNY to pay part of the water after the lease was signed.

13. Clause 8 of the Lease states that the "Lesee shall permit Lessor or Lessor's agent upon the premises at reasonable times and upon reasonable notice, for the purpose of inspecting the same."

14. The case arises out of a multi-year feud between the NGUYENS and CUMBO and CUMBO's in-laws the BECCARAS.

15. Since Lee Nails moved in to the space, the NGUYENS have been subject to incessant harassment and intimidation by the COUNTRYSIDE POLICE, CUMBO, and BECCARA.

16. There have been numerous disputes over parking, water usage, electricity, repairs, and CUMBO entering the nail salon without notice.

### Harassment and Intimidation of Nguyens Begins

17. On May 17, 2008 at approximately 4:00 pm, CUBMMO had entered and inspected Lee Nails without any notice whatsoever to the NGUYENS.

18. On May 25, 2008, around 1:30 pm, CUMBO had entered the backdoor and took a look around again without any notice.

19. On June 3, 2008, at about 9:30 am, CUMBO angrily confronted a long standing Lee Nails customer, Geannine Lynch, who had parked in the parking lot in back of Lee Nails, and told her in a nasty tone of voice that she couldn't park there and needed to move her car. At around 5:30 pm, CUMBO had once again entered and inspected the salon without notice.

20. CUMBO made it regular practice to enter the salon from both the front and back doors several times a week at any time of the day or evening without any prior notice whatsoever

and then walk though to inspect it even when there were customers there, in violation of Clause 8 of the Lease.

21. The NGUYENS asked CUMBO to cease the unannounced, impromptu, and improper inspection tours several times, especially so because her visits interfered with the NGUYENS' business by disturbing both their employees and their customers.

22. CUMBO not only did not honor the NGUYENS' requests or Clause 8 of the Lease, but informed them that "it was her building and she would do as she pleases."

23. On June 30, 2005, at approximately 5:00 pm, CUMBO came into the salon to get her nails done. While LINH was manicuring her nails, she requested that she should get nails done for free all the time instead of them paying the water bill.

24. CUMBO threatened DANNY that if he did not obey her request, then she would give him "a hard time." DANNY denied her request.

25. On August 17, 2005, at approximately 9:30 pm, DANNY had come to the salon for an appointment with a customer. The customer complained that she parked in the back of the building where there were also parking spaces for customers of Little Joe's. However, CUMBO said to her that she could not park there.

26. On September 10, 2005, approximately 11:30 am, several customers complained to DANNY that CUMBO was standing in the parking lot and asking customers, "Are you going to Lee Nails?" When the customers said yes, CUMBO told them that they could not park there then.

27. On October 12, 2005, CUMBO destroyed Lee Nails' telephone cords in the back of the building by pulling on them which damaged them and made them break so that Lee Nails could not use their phone.

28. On May 5, 2006, CUMBO called an electrician to fix the electricity for her

restaurant. However, the electricity box is located in the salon and she did not give any notice before entering.

29. On September 12, 2006, glue was placed in the key holds on the front and back locks of Lee Nails, as well as on the bell.

30. On September 13, 2006, at approximately 3:00 pm, CUMBO turned off the water to the salon for no reason. Water is required for the nail salon to do manicures and pedicures and as a result of no water, Lee Nails' could not do work for their customers.

31. On May 2, 2007, CUMBO ripped up an "AUTHORIZED PERSONNEL ONLY" sign posted on the front door of Lee Nails. Lisa Marie Nguyen and Geraldine Fali witnessed the incident.

32. On June 7, 2007, CUMBO stood in front of her restaurant, watching customers park in the parking lot, and once the customers walked out of their car, CUMBO would come up to them and ask if they were going to Lee Nails. The customers would say yes and CUMBO would tell them that they could not park there. CUMBO did this repeatedly on multiple occasions and customers of Lee Nails complained about this to the NGUYENS.

33. On August 2, 2007, the Countryside Police were called to resolve a landlord/tenant dispute between Lee Nails and CUMBO. LINH parked behind ANGELA BECCARA because there were no other spaces. ANGELA screamed and swore at LINH to move her car. The police were called and Officer Stern responded.

34. On August 3, 2007, LINH parked in the back parking lot just as ANGELA BECCARA had parked on August 2, 2007. BECCARA blocked LINH in with her car.

35. Later that day, CUMBO had electricians shut off the electricity to Lee Nails salon. CUMBO was escorted by Officers Mikel, Cozen, and Wherry to deliver a notice regarding repairs

needed at Lee Nails.

36. On October 24, 2007, a police incident report was filed by Officer Wherry regarding an "ongoing civil lease problem" between CUMBO and Lee Nails involving the electrical fix to the exterior lights.

37. On April 28, 2008, CUBMO requested that police escort her to deliver a letter complaining of a leaky toilet to Lee Nails. The letter demanded $190 for excess water usage. Officer Agostino Alonzo assisted CUMBO in delivering the letter.

38. On June 8, 2008, DANNY arrived at his salon to find that his water had been turned off. He immediately tried to contact his landlord, CUMBO ,about the problem, but was unable to reach her. Instead, he met with her daughter, ANGELA BECCARA. BECCARA told DANNY she did not know anything about the water problem, but told DANNY to wait while she investigated the matter.

39. DANNY waited from about 11:00 am to 2:30 pm to meet with CUMBO, but CUMBO never showed up. Instead, DANNY met with SAM BECCARA who acknowledged that the water had been turned off, but would be turned on again. However, the problem continued throughout the week. Because no water was available, customers like Denise Reanise, Shirley Fullor, Jennifer Krubl, and Jennifer Kuill who wanted pedicures were unable to get them.

40. On June 13, 2008, the water problem occurred again. Without notice the water had been shut off and there was no water to the salon. Customers once again complained that they could get their nails done because there was no water including Barbara Mazur, Laurie Severino, Vicki Notier, and Jaurice Nakovich.

41. The disruption and loss of business to Lee Nails' business caused by the water being turned off was severe as no customers could receive service as water was required for manicures

and pedicures. Moreover, a lack of water made the salon unsanitary.

42. On June 14, 2008, Officer James Stern came to the salon to resolve the water problem. DANNY complained about the water issue and that his landlord had given no notice before turning off the water. Officer Stern tried to reach CUMBO about the problem, but was only able to speak with ANGELA BECCARA. BECCARA told Officer Stern that the water had only been turned off at night, but turned back on in the morning, due to construction at Little Joe's.

### Nguyens Detained and Arrested

43. On September 15, 2008, at roughly 7:57 pm, ANGELA BECCARA called the COUNTRYSIDE POLICE to report water running in a sink at Lee Nails. Officer Stern and Officer Muszynski responded to the call and based on information and belief conspired with the BECCARAS to commit false arrest later that evening.

44. At about 8:15 pm on September 15, 2008, LINH was engaged in a Buddhist prayer in front the nail salon outside. She knelt down facing the salon and lit incense with a novelty lighter shaped like a gun, which is part of the NGUYENS' daily prayer ritual. As LINH was praying, SAM BECCARA walked past LINH and called 911 to report a "lady with a gun." Officers Stern and Muszynski responded. They immediately call for backup and several squad cars surrounded the nail salon and strip center.

45. One of the officers immediately grabbed LINH, arrested her, and placed her in handcuffs and sat her down in front of the salon.

46. One of the officers entered the back room of the salon and said "Hey you" to DANNY. DANNY said, "What happened?" The officer said "Come over here right now!" DANNY said, "What? What happened?" The officer said "Motherfucker you come over here!"

DANNY went over to where the officer was and was handcuffed, escorted outside, and placed down near where LINH was sitting in front of the salon.

47. LINH then heard two of the officers shout, "Go arrest her too!," meaning her sister, MYDUNG. LINH frantically stood up to see what was happening to her sister. The officer who was observing LINH grabbed her right arm and the second officer who was observing DANNY rushed over to help push LINH down by grabbing her left arm. Together, both officers pushed LINH down to the pavement while holding her arms. At that time, LINH lost her balance and fell forward on her knees and then fell backwards from the pressure of the handcuffs on her wrists and the amount of pressure placed on her arms by the police. Consequently, she sustained serious bruising and injuries. The events were witnessed by-stander Joanne Moore.

48. The officers harshly yelled, "Sit down!" All the while, LINH had been silent, never said a word, and obeyed all police commands. The police never told LINH why she had been arrested, what was going on, and did not read her Miranda rights. They told her, "Whatever you want to say, say it to the judge."

49. MYDUNG became startled as she watched her siblings being detained and taken outside and ordered to sit on the pavement. MYDUNG saw LINH being handcuffed and then saw DANNY arrested. MYDUNG panicked as she grabbed the phone and ran to the back room to call her friend as she was scared and did not know what was happening.

50. Two officers had followed MYDUNG and one of them grabbed the phone out of her hand. MYDUNG asked "What happened?" One officer said, "You are under arrest mother fucker, shut up, and read my lips!" He then took her arms and yanked them behind her. As he was trying to handcuff MYDUNG, she told the officer that he was hurting her and then the

officer yanked even harder and handcuffed her. The officers proceeded to push MYDUNG outside into a squad car. By this time, DANNY and LINH were both handcuffed and sitting on the pavement. After about five to ten minutes, DANNY, LINH, and MYDUNG were all taken to the Countryside police station in separate squad cars and placed in different jail cells.

51. The officers never explained to DANNY, LINH, or MYDUNG what was happening, why they were being arrested, or read them their Miranda rights.

52. MYDUNG was handcuffed in the cell to a bench so she could not freely move in the cell. Her sister LINH had immediately asked to make a phone call, but was initially denied. Finally, after about an hour of constant begging, she was allowed to call a family member to bail her out, but the officer made it clear with her that she was only allowed "a minute" on the phone.

53. MYDUNG then asked the police to use the bathroom. She was told to remove all of her jewelry. Since her bracelets were very difficult to remove, MYDUNG asked how long she and her family would be held and told "not long" so she decided at that time to wait.

54. After forty minutes passed, MYDUNG was taken to be fingerprinted. Afterwards, she was returned and again handcuffed to the bench. They were so tight her hand turned purple. She asked an officer passing by to loosen the handcuffs and he did. However, by this time, her hand was already cold and numb.

55. After about another hour passed, MYDUNG called out for someone to come. MYDUNG said she needed to go to the bathroom as she couldn't wait any longer. There was no response. She took her shoe off and banged on the wall with it to get officers' attention. She was in a lot of pain at that point. The officers never came so she was forced to urinate on the floor in the spot where she was handcuffed as she could not move. There were cameras mounted above her and MYDUNG was humiliated as she was being monitored, but given the

emergency nature of the situation, had no choice but to go.

56.   Approximately thirty minutes later, an officer came and asked her what she had done.   She told him she could not wait any longer and he asked her why she did not defecate too.   He said she was "ridiculous."

57.   After about forty minutes, at 1:40 am, the NGUYENS were all released. MYDUNG's mother, friend, neighbor and daughter were all waiting for them.   They had been waiting 4 ½ hours for their release.

## The Harassment Against Nguyens' Continues

58.   On or about September 20, 2008, two Countryside police officers (one in an unmarked vehicle) were reported inspecting and photographing the NGUYEN residence on 8th Avenue in Countryside.

59.   On September 20, 2008, the landlord had once again shut off the water to Lee Nails.   Numerous customers could not receive service and complained including Justin Joeyl, Diane Trezek, Tammy Chavez, Tracy Wasserstein, Amy Van Dyke, Carmella Lonero, Kim Kozarits, and others[1].

60.   The NGUYENS lost a substantial amount of business and sustained financial harm as a result of the water being turned off.

61.   On October 1, 2008, three Countryside Officers came to Lee Nails to issue Citation CC #12174 for theft of water.   A copy of the citation is attached herein as **Exhibit B**.

---

[1] On September 20, 2008, Kozartis and eight other women came in to get pedicures for a wedding night but couldn't because the water wasn't turned on. Customers Auuel Paaker and her daughter came in for pedicures, but couldn't because water was not turned on and had to reschedule. Customers  Kashai Bright and Amanda Caldwell were witnesses that the water pressure weakened to a small drizzle making it impossible to perform pedicures and rendering the washroom unusable.

The ticket was issued after CUMBO and/or the BECCARAS complained to the police that Lee Nails was using excessive water. According to the report, ANGELA BECCARA and her employee Jose saw the water running unattended for approximately ten minutes that evening. However, according to other customers-witnesses, Eileen Marchetti and Josette Legris, there was no water on at the time or for two hours prior to the officers coming into the salon.

62. On March 19, 2009, Judge Belmonte, in Case Number CC12174, dismissed the Citation and reversed the fines after finding that Lee Nails did not steal any water. A copy of the finding is attached herein as **Exhibit C**.

63. On October 15, 2008, a regular customer of Lee Nails, Jackee LaRicca, who was receiving nail treatment, saw and witnessed an unknown car, parked across the street from the salon at John's Auto Body, shining his bright headlights into the salon for at least 20-30 minutes and staking out the salon until it closed at approximately 8:15 pm.

64. On October 28, 2008, a regular customer of Lee Nails, Dr. Louise Eggert-Nevins, saw and witnessed that a man came into Lee Nails and very sarcastically asked, "What time is it? Do you have a clock?." The customer was surprised because Lee Nails is not a traffic thoroughfare. The customer and LINH noticed that the man left laughing and walked to the corner and entered Little Joe's.

65. On November 3, 2008, between 6-7 pm, Lee Nails customer, Kelli Charse, and her daughter, were in the salon being serviced and witnessed SAM BECCARA walking past the salon numerous times and parking in front on the salon talking with his friends for a lengthy period of time, making them and other Lee Nails customers feel very uncomfortable.

66. On January 22, 2009, at approximately 3:00 pm, SAM BECCARA harassed a Lee Nails' customers, Laurie, in front of LINH and other customers, saying, "I recognize you.

You're from the Head School Board of Saint Cletus. I have a child who attends Saint Cletus too. Why do you even defend these people who have a gun?"

67. On January 26, 2009, at approximately 10:00 am, LINH had an appointment with her customer Laurie Severino. Severino had come a little early and was waiting in her car. ANGELA BECCARA saw Severino in the parking lot, started approaching her by walking straight towards her car. Severino was immediately frightened and frantically took out her cell phone to take a picture of her. As soon as BECCARA saw the cell phone facing towards her, she then turned back and headed towards Little Joe's.

68. On February 25, 2009, at approximately 6:30 pm, a regular customer, Jill Jirsa, saw a young man come into Lee Nails and ask, "What time is it?" After LINH answered his question, he then walked to the corner and entered Little Joe's. As Jirsa waited for her nailed to dry, the same young man came into the salon at about 7:30 pm and asked the same question, "What time is it?" and then walked away.

69. On March 3, 2009, at approximately 12:45 pm, LINH heard some noises that were coming from the back of the salon. He then went to the back and opened the door to see what was happening. When he did, he saw SAM BECCARA standing with an unfamiliar person. SAM BECCARA then pointed his finger at LINH and commanded her to "Get back into your room!" LINH was frightened and quickly closed the door. About 15 minutes later, her brother DANNY, came to work. When he came out of the car, SAM BECCARA commanded the unknown man that was standing with him earlier to approach DANNY.

70. DANNY was frightened and quickly entered the salon and shut the door behind him. DANNY told his sister what happened in the parking lot. When LINH heard what DANNY said, she told him what had happened to her early. LINH then waited a few minutes

later and opened the door.  When she did, she saw that SAM BECCARA and the unknown man were still in the parking lot.

71.  When LINH noticed that they were still there, SAM BECCARA  then commanded the unknown man to "Go get them!"   When LINH heard those words, she  became terrified and shut the door. LINH was so scared that she asked her customer to help her and call the police.  But when her customer called, the police refused to show-up though an incident report was made.   At the same time, ANGELA BECCARA started taking pictures of LINH's customers.

72. On March 30, 2009, at approximately 9:15 pm, LINH's four family members including LINH, were leaving Lee Nails.  LINH securely locked the back door, and all her family members saw that she locked it very securely.  LINH even tugged on it to make sure it was secure.  About 15 minutes later, when she got home, she received a phone call from the Countryside Police Department saying that the back door to the salon was opened about 4 inches wide.  LINH then got frightened and immediately went back to Lee Nails to check the door and surrounding of the salon.   It seemed locked up and secure as LINH checked the front and back door.

73.   LINH then drove to the Countryside Police Department to find out what exactly had happened.  When LINH arrived there, she spoke with Officer Ernest Millsap.   She asked him how he knew that the door was open and he told her that ANGELA BECCARA called them and reported that the door was opened.   LINH became very suspicious as she had looked the door securely as the only way that a person could have opened the door was if the person had a key.

74.  On May 19, 2009, at approximately 10:05 am, a scary looking stranger (bald and

muscular) was waiting for DANNY to arrive at work.   The man immediately rushed up to DANNY with a menacing look and said, "How do you get to Radioshack?"   The man's car was parked next to DANNY's landlord's car (identified as a white Hummer), near an alley, and had no license plates on the front or back.   DANNY became terrified and did not answer.  Instead, a customer, Mary Nickels, came out to explain where Radioshack was.   The stranger quickly hurried away and drove the wrong way.

75.  On June 24, 2009, there was a witness that saw Fire Marshalls that harassed the NGUYENS by giving them a lecture about how they could not lock the door when customers were present.  They did not give this lecture or inform other businesses in the strip plaza, but waited for LINH's arrival with a friend who was not a customer, gave the lecture, then walked over to Little Joe's.

76.  On July 3, 2009, the police came to Lee Nails to make a complaint on behalf of CUMBO and Little Joe's, the restaurant CUMBO owns.   The policeman told the friend to stop taking pictures and that they were making CUMBO nervous.

77.   The NGUYENS have been so terrorized and afraid of CUMBO and the BECCARAS' that they lock the door to their store.  The numerous acts of harassment and intimidation has caused the NGUYENS severe emotional distress.   They have also been victims of crime[2].

78.  The NGUYENS have recently moved out, but continue to pay rent.  However, the locks have been changed on the front door and CUMBO has used their space to store her own property.   DANNY filed an incident report with the Countryside Police among the numerous

---

[2] Sometime between May 20, 2008 and May 21, 2008, Lee Nails was burglarized and $1,000 was stolen after forced entry through the North front door.

others filed by the NGUYENS, attached herein as **Group Exhibit D.**

79.  On November 12, 2009, the landlord reportedly entered 26 E. Plainfield Rd. in Countryside accompanied by the police and unplugged the electrical equipment without the NGUYENS' permission.

80.  On November 15, 2009, DANNY and another visitor requested a police report at their salon regarding the incident with the electrical equipment being unplugged without permission and authorization.

81.  On January 7, 2010, the landlord had changed the locks at 26 E. Plainfield Rd. which she also used for storing ceiling tiles and fans in the building without the NGUYENS' permission. The landlord then stated that her attorney had said DANNY was not allowed to remove any of his cameras.

82.  On January 14, 2010, the signage that DANNY left in front of his window of the space he rents at 26 E. Plainfield Rd. which was there to direct his customers to his new location was taken down by the landlord without permission and authorization.

83.  Due to the severity of the harassment, intimidation, and abuse of the NGUYENS by the Countryside Police and the NGUYENS' landlord, concerned customers including Betty Maier and Delphine Schenider, wrote letters to the Countryside Mayor, Robert Conrad, and Countryside Chief of Police to complain and request an investigation.   See **Group Exhibit E** attached herein.   Numerous customers also wrote letters to Illinois Attorney General, Lisa Madigan, to complain and to request investigation into the matter.   See **Group Exhibit F** attached herein.

## COUNT I
## VIOLATION OF
## OF THE CIVIL RIGHTS ACT OF 1971
## 42 U.S.C. § 1983

### Police Use of Excessive Force
### (MyDung and Linh Against CountrySide Police)

1-83   Plaintiffs MYDUNG and LINH re-allege and reincorporate paragraphs 1-83 as paragraphs 1-83 of this Count I.

84.   The COUNTRYSIDE police officers who arrested the Plaintiffs were acting under color of Illinois state law at the time they made the arrests.

85.   The police officers denied the plaintiff the protections of the U.S. Constitution.  In particular, the police officers had violated the Fourth and Fifth Amendment rights of the plaintiffs.

86.   The plaintiffs were entitled and a right to be protected from unreasonable searches and seizures including protection and a right to be free from excessive force used by the police.

87.   The plaintiffs were searched and seized when they were apprehended and arrested within the meaning of the Fourth Amendment.

88.   The officers used excessive force in detaining and apprehending the plaintiffs.

89.   LINH and MYDUNG sustained substantial black, blue, and purple bruising as a result of the excessive force.

90.   LINH sustained substantial bruising on her arms and legs as a  result of the excessive force using by officers in knocking her down and restraining her arms.

91.   MYDUNG sustained substantial bruising to her hands and wrists from excessive force placed on her in the handcuff restraints.

92.   LINH and MYDUNG have incurred damages of severe injuries, pain, and suffering as a result of the excessive force used by the officers.

WHEREFORE, Plaintiffs LINH and MYDUNG pray for judgment against Defendant COUNTRYSIDE POLICE DEPARTMENT as follows:

A. Compensatory damages to be determined at trial.
B. Punitive damages to be determined at trial.
C. Reasonable attorneys fees and court costs.
D. Any other relief that this court deems just and equitable.

## COUNT II

## NEGLIGENCE
### (MyDung and Linh Nguyen Against Countryside Police)

1-83. Plaintiffs MYDUNG and LINH re-allege and reincorporate paragraphs 1-83 as paragraphs 1-83 of this Count II.

84. The COUNTRYSIDE police officers who arrested the Plaintiffs were acting under color of Illinois state law at the time they made the arrests.

85. The police officers owed a duty of care to the plaintiffs when making an arrest.

86. The police officers breached that duty of care by failing to act like a reasonable officer would have acted given the situation.

87. In particular, a reasonable police officer would not have grabbed a tiny woman (LINH) and pushed her so hard while she was handcuffed so that she would sustain injuries and would not have handcuffed a person (MYDUNG) so tight as to cause injury to their hands and wrists.

88. LINH and MYDUNG sustained substantial black and blue bruising as a result of the excessive force.

89. LINH sustained substantial bruising on her arms and legs as a result of the excessive force using by officers in knocking her down and restraining her arms.

90. MYDUNG sustained substantial bruising to her hands and wrists from excessive force placed on her in the handcuff restraints.

17

91.  The police officers were the direct and proximate cause of the harm to LINH and MYDUNG.

91.  LINH and MYDUNG have incurred damages of severe injuries, pain, and suffering as a result of the excessive force used by the officers.

WHEREFORE, Plaintiffs LINH and MYDUNG pray for judgment against Defendant COUNTRYSIDE POLICE DEPARTMENT as follows:

A. Compensatory damages to be determined a trial.
B. Punitive damages to be determined at trial.
C. Reasonable attorneys fees and court costs.
D. Any other relief that this court deems just and equitable.

## COUNT III
## VIOLATION OF
## OF THE CIVIL RIGHTS ACT OF 1971
## 42 U.S.C. § 1983

### Illegal Detention
### (Danny Nguyen Against Countryside Police)

1-83.   Plaintiff DANNY re-alleges and reincorporates paragraphs 1-83 as paragraphs 1-83 of this Count III.

84.  The Countryside police officers who arrested the Plaintiffs were acting under color of Illinois state law at the time they made the arrests.

85.  The police officers denied the plaintiff the protections of the U.S. Constitution.  In particular, the police officers violated the plaintiff's Fourth and Fifth Amendment rights.

86. The plaintiff was entitled and a right to be protected from unreasonable searches and seizures including protection and a right to be free from illegal detention.

87. The plaintiff was searched and seized when he was apprehended and detained within the meaning of the Fourth Amendment.

88.  The police had no probable cause to detain and seize DANNY as the police did not have a search warrant and had no reason to believe that DANNY had engaged in any criminal act.

89.  To the contrary, DANNY cooperated, obeyed all commands, and did not resist arrest even though he was never told what was going on, why he was being arrested, or read his Miranda rights.

90. DANNY was restrained, detained, and arrested against his will both outside the salon and when he was placed in jail.

91.  DANNY was unnecessarily and wrongfully detained.

92. The detention was procured by the COUNTRYSIDE POLICE DEPARTMENT without having reasonable grounds or probable cause to believe that these offenses had been committed in violation of DANNY's Fourth Amendment rights.

92. As a direct and proximate cause of the illegal detention, DANNY has sustained pain, anguish, and emotion suffering.

WHEREFORE, Plaintiff DANNY prays for judgment against Defendant COUNTRYSIDE POLICE DEPARTMENT as follows:

A. Compensatory damages to be determined at trial.
B. Punitive damages to be determined at trial.
C. Reasonable attorneys fees and court costs.
D. Any other relief that this court deems just and equitable.

# COUNT IV
# VIOLATION OF
# OF THE CIVIL RIGHTS ACT OF 1971
# 42 U.S.C. § 1983

## False Arrest
## (Danny Nguyen Against Countryside Police)

1-83.   Plaintiff DANNY re-alleges and reincorporates paragraphs 1-83 as paragraphs 1-83 of this Count IV.

84. The Countryside police officers who arrested the Plaintiffs were acting under color of state law at the time they made the arrests.

85. The police officers denied the plaintiff the protections of the U.S. Constitution or federal law.  In particular, the police officers had violated the Fourth and Fifth Amendment rights of the plaintiffs.

86.  The plaintiffs was entitled and a right to be protected from unreasonable searches and seizures including protection and a right to be free from false arrest.

 87. The plaintiff was searched and seized when he was apprehended and detained within the meaning of the Fourth Amendment.

88.  The police had no probable cause to detain and seize DANNY as the police did not have a search warrant and had no direct knowledge that DANNY had engaged in any criminal act.

89.  To the contrary, DANNY cooperated, obeyed all commands, and did not resist arrest even though he was never told what was going on, why he was being arrested, or read his Miranda rights.

90. DANNY was restrained, detained, and arrested against his will and unnecessarily seized.

91. The police charged DANNY with two counts of obstruction of justice.

92. DANNY had to close his business for 14 days, losing substantial business, to appear in court.

93. The arrest was procured by the COUNTRYSIDE POLICE DEPARTMENT without having reasonable grounds or probable cause to believe that these offenses had been committed.

94. The judge dismissed all charges against DANNY because he found there was no probable cause to bring the charges.

95. As a direct and proximate cause of the false arrest, DANNY has sustained financial and emotional harm.

WHEREFORE, Plaintiff DANNY prays for judgment against Defendant COUNTRYSIDE POLICE DEPARTMENT as follows:

A. Compensatory damages to be determined at trial.
B. Punitive damages to be determined at trial.
C. Reasonable attorneys fees and court costs.
D. Any other relief that this court deems just and equitable.

## COUNT V
## VIOLATION OF
## OF THE CIVIL RIGHTS ACT OF 1971
## 42 U.S.C. § 1983

### Jail Abuse
### (MyDung Nguyen Against Countryside Police)

1-83. Plaintiff MYDUNG re-alleges and reincorporates paragraphs 1-83 as paragraphs 1-83 of this Count V.

84. The COUNTRYSIDE police officers who arrested MYDUNG were acting under color of Illinois state law at the time they made the arrest.

85. The police officers denied the plaintiff the protections of the U.S. Constitution.

In particular, the police officers had violated the Eighth Amendment rights of MYDUNG.

86.  The plaintiff was entitled to be protected from cruel and unusual punishment including the right to be free from inhumane jail conditions, treatment, and abuse.

87. MYDUNG was handcuffed to a bench, restrained in movement, and unable to move in her cell.

88. MYDUNG was denied the use of a bathroom by the police and forced to urinate in her cell and to be humiliated and videotaped.

89. MYDUNG sustained substantial bruising to her hands and wrists from being handcuffed so tight to the bench in the cell for at least 3 ½ hours.

90.  MYDUNG has sustained injuries including, but not limited to, bruising, humiliation, pain, and suffering as a result of the violation her Eighth Amendment Rights.

WHEREFORE, Plaintiffs MYDUNG prays for judgment against Defendant COUNTRYSIDE POLICE DEPARTMENT as follows:

A. Compensatory damages to be determined at trial.
B.  Punitive damages to be determined at trial.
C. Reasonable attorneys fees and court costs.
D. Any other relief that this court deems just and equitable.


## COUNT VI

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Nguyens Against Combo, Sam Beccara, and Angela Beccara)

1-83. Plaintiffs re-allege and reincorporate paragraphs 1-83 as paragraphs 1-83 of this Count VI.

84.    The conduct and numerous acts engaged in by Defendants CUMBO, SAM BECCARA, and ANGELA BECCARA against the NGUYENS were intentional, willful, and malicious.

85. In particular, CUMBO intended to maliciously shut off the NGUYENs electricity, turn off their water, rip up their signs, change their locks, enter their salon without notice, harass their customers, and harass the NGUYENS. Similarly, SAM and ANGELA BECCARA intended to harass and intimidate the NGUYENS by making false police reports, sending unknown people into their salon to harass them, ordering unknown people to "get them," harassing their customers about parking, and yelling at the Plaintiffs in front of their customers and other employees.

86. The Defendants intended that their conduct would inflict severe emotional distress on the Plaintiffs or knew that there was a high probability that their conduct would do so.

87. The conduct by CUMBO, SAM BECCARA, and ANGELA BECCARA was extreme and outrageous. In particular, the harassment and intimidation was frequent and over a long period of time and so bad that the NGUYENS were compelled to move out of their salon.

88. The Defendants' behavior and conduct was a direct and proximate cause of the Plaintiffs' severe emotional distress and suffering.

WHEREFORE, Plaintiff DANNY prays for judgment against Defendant COUNTRYSIDE POLICE DEPARTMENT as follows:

A. Compensatory damages to be determined at trial.
B. Punitive damages to be determined at trial.
C. Reasonable attorneys fees and court costs.
D. Any other relief that this court deems just and equitable.

## COUNT VII

## BREACH OF CONTRACT
## (AGAINST CUMBO)

1-83. Plaintiff DANNY re-alleges and reincorporates paragraphs 1-83 as paragraphs 1-83 of this Count VII.

23

84. CUMBO and DANNY entered into a valid and binding commercial Lease attached hereto as **Exhibit A**. In particular, there was an offer of space by CUMBO, acceptance by DANNY, and consideration of monthly rental payments from DANNY to CUMBO.

85. CUMBO has changed the front locks to the salon so that DANNY cannot use the space and deprived DANNY of use of the space in violation of Clause 1 at the term has not expired.

86. CUMBO has entered the salon at unreasonable times and/or without notice in violation of Clause 8.

87. Despite numerous requests by the NGUYENS, CUMBO failed to repair the front entrance door to the salon which was old, dilapidated, and kept squeaking. The NGUENS' tried to repair it themselves, but could not due to the door's dilapidation.

88. CUMBO has used the salon space to store her personal items in violation of DANNY's exclusive use of the space in violation of Clause 1.

89. DANNY has fully performed his contractual obligations to pay monthly rent to CUMBO. No back rent is owed.

90. CUMBO agreed to supply and pay for the water to the nail salon, but wrongfully had the water shut off on numerous occasions.

91. CUMBO breached the terms of the Lease.

92. As a direct and proximate cause of the breach, DANNY has sustained damages.

WHEREFORE, Plaintiff DANNY prays for judgment against Defendant CUMBO as follows:

A. Compensatory damages to be determined at trial.
B. Punitive damages to be determined at trial.
C. Reasonable attorneys fees and court costs.
D. Any other relief that this court deems just and equitable.

## COUNT VII

## PRIVATE NUISANCE
### (Nguyens Against Cumbo and the Beccaras)

1-83. Plaintiffs re-allege and reincorporate paragraphs 1-83 as paragraphs 1-83 of this Count VII.

84. CUMBO and the BECCARAS engaged in harmful non-tresspassory conduct with the intent of causing harm to the NGUYEN"s use and enjoyment of their land and/or with knowledge that harm was substantially certain to result.

85. CUMBO and ANGELA BECCARA interfered with the right of Lee Nails customers to park in common areas for parking by harassing and yelling at them to move their cars. To wit, the NGUYENS were granted an easement for their customers to park in front of and in back of the strip center, but CUMBO and the BECCARAS interfered with its use.

86. CUMBO wrongfully changed the locks to the salon so that the NGUYENS could not enter their leased space.

87. CUMBO wrongfully had the electricity turned off and repeatedly had the water shut off to the NGUYENS' salon to harass them and to cause substantial harm to their business.

88. Based on information and belief, CUMBO and/or the BECCARAS placed glue into the locks on the salon.

89. The BECCARAS sent unknown individuals into the NGUYENS' salon to harass them.

90. THE BECCARAS took pictures of the NGUYENS in their salon without their permission with the intent to harass, stalk, and/or spy on them.

91. SAM BECCARA stood outside the salon, loitering in front, to discourage customers from entering and to harass the NGUYENS by repeatedly shouting, menacing, and threatening them to "Get back in their room!" and directing others to "Go get them!" when they opened the door to their salon.

92. CUMBO and the BECARRAS' conduct was unreasonable, harmful, and egregious.

93. Such acts invaded the private use and enjoyment of the NGUYENS' exclusive use of their land, namely the leased space at 26 E. Plainfield Road.

94. Such interference would be considered a material annoyance and inconvenience to a reasonable person.

95. As a direct and proximate cause of the breach, the NGUYENS' has sustained damages including the inability to use their own leased space and operate their business.

WHEREFORE, Plaintiff NGUYENS prays for judgment against Defendant CUMBO as follows:

A. Compensatory damages to be determined at trial.
B. Punitive damages to be determined at trial.
C. Reasonable attorneys fees and court costs.
D. Any other relief that this court deems just and equitable.

## COUNT VIII

### INTRUSION UPON SECLUSION
### (Nguyens Against Cumbo and Beccaras)

1-83. Plaintiffs re-allege and reincorporate paragraphs 1-83 as paragraphs 1-83 of this Count VIII.

84. CUMBO and the BECCARAS engaged in unauthorized intrusion and/or prying into

the plaintiffs' seclusion, namely, the plaintiffs' right to operate their salon with reasonable privacy free from harassment, intimidation, spying, and intrusion.

85. CUMBO interfered with the right of Lee Nails customers to park in common areas for parking by harassing and yelling at them to move their cars. To wit, the NGUYENS were granted an easement for their customers to park in front of and in back of the strip center.

86. CUMBO changed the locks to the salon so that the NGUYENS could not enter their leased space.

87. Based on information and belief, CUMBO and/or the BECCARAS have sent and directed unknown individuals into the NGUYENS' salon for the sole purpose to harass them and harm their business as well as harass and intimidate them outside of the salon.

88. Based on information and belief, CUMBO and/or the BECCARAS along with unknown individuals that have conspired with the CUMBO and /or the BECCARAS, have spied on and stalked the NGUYENS and intruded upon their seclusion.

89. Such matters upon which the intrusions have occurred are private. In particular, the NGUYENS had a reasonable expectation of privacy to not be spied upon, stalked, harassed, intimidated, have people watching them, tracking their movements, taking pictures of them, shining headlights into their salon, and prying into their business at the salon.

90. The Defendants' acts are unreasonable, unwarranted, and/or unlawful.

91. Such acts invaded the private use and enjoyment of the NGUYENS' exclusive use of the leased space at 26 E. Plainfield premises.

92. Such intrusion would be considered objectionable and offensive to a reasonable person.

93. As a direct and proximate cause of the breach, the NGUYENS' has sustained

damages including anguish and suffering.

WHEREFORE, Plaintiff NGUYENS prays for judgment against Defendant CUMBO as follows:

A. Compensatory damages to be determined at trial.
B. Punitive damages to be determined at trial.
C. Reasonable attorneys fees and court costs.
D. Any other relief that this court deems just and equitable.

## COUNT IX

## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (Nguyens Against Cumbo and Beccaras)

1-83.  Plaintiffs re-allege and reincorporate paragraphs 1-83 as paragraphs 1-83 of this Count IX.

84.  The NGUYENS had valid existing business relationships with numerous salon customers who regularly used the nail salon services.   In addition, the NGUYENS had a reasonable expectation of entering into valid business relationships with new customers.

85.  CUMBO and the BECCARAS had knowledge of these relationships and had knowledge of the plaintiffs' expectancy to enter into a valid business relationship.  In  particular, they knew that the NGUYENS were running a nail salon, had a commercial lease to rent space for the salon, and had valid business relationships with their customers and an expectancy of new customers through referrals.

86.   CUMBO and the BECCARAS' intentionally interfered with the NGUYENS' business relationships through their harmful conduct which induced termination of some of these relationships and/or prevented the expectancy from ripening into valid business relationships.

87.   CUMBO and the BECCARAS intended and/or were substantially certain that their

conduct would induce the NGUYENS' customers to stop patronizing their salon and induce termination of existing business relationships.

88. Due to the repeated egregious acts, harassment, and intimidation by CUMBO and the BECCARAS towards the NGUYENS and their customers, numerous customers that the had existing business relationships have stopped doing business with them.

89. The harassment, threats, and intimidation towards the NGUYENS became so bad that the NGUYENS moved out of their salon for fear of their own lives.

90. Numerous customers feared for their own lives because they believe the NGUYENS' landlord and her family are insane (based on their first hand experience with them), capable of hurting them, and/or getting them arrested, especially in light of the NGUYENS' arrest which substantially harmed their reputation with their customers.

91. As a direct and proximate result of the Defendants' interference, the NGUYENS have sustained substantial financial harm to their salon business.

WHEREFORE, Plaintiff NGUYENS prays for judgment against Defendant CUMBO as follows:

A. Compensatory damages to be determined at trial.
B. Punitive damages to be determined at trial.
C. Reasonable attorneys fees and court costs.
D. Any other relief that this court deems just and equitable.


Respectfully Submitted,

DUNG NGUYEN, LINH NGUYEN,
MYDUNG NGUYEN

/s/ Justin London_____
Plaintiffs' Attorney

Justin London
LAW OFFICES OF JUSTIN LONDON
1920 N. Maud, Ste. A
Chicago, IL 60614
(773) 528-1433
Attorney No: 6293251