IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DUNG NGUYEN, MYUNG NGUYEN, and )
LINH NGUYEN, )
) CASE NO.: 10-CV-504
)
Plaintiffs, ) Judge Robert M. Dow, Jr.
)
)
ANNA CUMBO, SAM BECCARA, )
ANGELA BECCARA, )
CITY OF COUNTRYSIDE, JAMES STERN, )
STEVE MUSZYNSKI, and JOHN MIKEL, )
)
Defendants. )

**MEMORANDUM OPINION AND ORDER**

Defendants Anna Cumbo, Sam Beccara, and Angela Beccara ("Defendant Lessors") move this court to dismiss the counts pled against them in Plaintiffs' Fourth Amendment Complaint under Federal Rule of Civil Procedure 12(b)(1). Plaintiffs Dung Nguyen ("Danny"), Mydung Nguyen ("Mydung"), and Linh Nguyen ("Linh"), collectively "Plaintiffs," oppose this motion. For the following reasons, the Court grants Defendant Lessors' motion to dismiss [39] Plaintiffs' claims against them without prejudice for lack of subject-matter jurisdiction.

**I.   Background**[1]

On January 25, 2010, Plaintiffs filed the instant lawsuit against Defendant Lessors, the City of Countryside, Illinois ("the City"), the Countryside Police Department, Countryside Police Officers James Stern and Steve Muszynski, and Countryside Police Sergeant John Mikel ("Defendant Officers") [1]. On March 19, 2010, Plaintiffs filed a Third Amended Complaint,

---

[1] For purposes of Defendant's motion to dismiss, the Court assumes as true all well-pleaded allegations set forth in the complaint. See, e.g., *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). Unless otherwise specified, all citations in this section correspond to Plaintiff's Fourth Amended Complaint [37].

1

withdrawing the Countryside Police Department from their lawsuit [27]. On April 27, 2010, Plaintiffs filed a Fourth Amended Complaint [37], and on May 12, 2010, Defendant Lessors filed the instant motion to dismiss the claims against them pursuant to Federal Rule of Civil Procedure 12(b)(1) [39].

Plaintiffs are sibling Vietnamese immigrants who together own and operate Lee Nails, a nail salon in Countryside, Illinois that was located in the strip mall owned by Defendant Anna Cumbo ("Cumbo"). ¶¶ 8-9. Cumbo also owns a diner inside the strip mall called "Little Joe's." ¶ 9. Defendant Angela Beccara is Cumbo's daughter. Angela is married to Defendant Sam Beccara. ¶¶ 4-5.

On March 17, 2005, Lee Nails entered into a five-year commercial lease with Cumbo to rent space in her strip mall. ¶ 11. Plaintiffs allege that soon after their lease began, Anna Cumbo, and eventually her daughter and son-in-law, began a pattern of harassment towards Lee Nails and its customers that continued until Plaintiffs were forced to move out of their salon. Plaintiffs allege that Cumbo repeatedly inspected Lee Nails without reasonable notice as required by their lease (¶¶ 17-22; 28), that she harassed and prevented customers from parking in the parking lot (¶¶ 19, 25-26, 32), that she destroyed the business's telephone cords (¶ 27), that she placed glue in their locks (¶ 29), that she repeatedly turned off the water to the salon, rendering them unable to perform manicures (¶¶ 30, 38-40, 38-42, 59), and that she ripped an "AUTHORIZED PERSONNEL ONLY" sign from the front door of Lee Nails (¶ 31). Defendants Sam and Angela Beccara allegedly assisted in some of these acts. Plaintiffs suggest that this behavior began because Cumbo was upset over being denied free manicures by the salon. ¶¶ 23-24.

According to Plaintiffs, as the harassment by Cumbo escalated, Cumbo began utilizing the City police force against the salon. Plaintiffs allege that numerous officers in the Countryside Police Department, including the Defendant Officers, receive free food from Little Joe's and are friends with Cumbo and the Beccaras. ¶ 10. On August 2, 2007, Linh and Angela Beccara got into a screaming match over a parking space, and the police were called. ¶ 33. Defendant Officer Stern and another Countryside police officer responded and told the Nguyens that they would be arrested if they did not settle the ongoing dispute with their landlord. *Id*. The next day, Cumbo had an electrician shut off the power to Lee Nails. ¶ 35. Later that day, Cumbo was escorted by Defendant Officer Mikel and two other officers as Cumbo delivered a notice regarding repairs needed at the salon. *Id*. On October 24, 2007, one of these officers (Officer Wherry) filed a police report documenting an "ongoing civil lease problem" between Cumbo and Lee Nails involving the electrical fix to the exterior lights. ¶ 36. On April 28, 2008, Officer Agostino Alonzo escorted Cumbo when as she delivered a $190 bill for excess water usage. ¶ 37. Plaintiffs allege that under the terms of the Lease, sewer and water bills are to be paid by the Lessor. ¶ 12. On June 14, 2008 Defendant Officer Stern came to the salon to attempt to resolve the water dispute, but was unable to do so. ¶ 42.

According to Plaintiffs, on September 15, 2008, at approximately 8 p.m., Angela Beccara called the Countryside Police to report water running in a sink at Lee Nails. ¶ 43. Officer Stern and Muszynski responded to the call. At approximately 8:15 p.m., Sam Beccara witnessed Linh Nguyen outside of the salon, using a gun-shaped cigarette lighter to light incense as part of her daily Buddhist prayer ritual. ¶ 44. Sam called 911 to report a "lady with a gun." *Id*. Defendant Officers Stern and Muszynski returned to the nail salon. ¶ 44. The officers called for backup to

handle the situation, and several other officers in squad cars arrived, including Defendant Sergeant Mikel. *Id.*

One of the officers immediately grabbed Linh, arrested her, handcuffed her, and sat her down in front of the salon. ¶ 45. Officers then entered the salon and arrested Danny, who was in the back room. ¶ 46. When Linh attempted to stand and see what was happening, Defendant Officers Stern and Muszynski allegedly pushed her down to the pavement, and she then lost her balance, the impact of the fall causing serious bruising and injuries. ¶ 47. Mydung attempted to call a friend from the back room, but an officer grabbed the phone while Sergeant Mikel roughly handcuffed her and placed her under arrest. ¶ 50. Plaintiffs allege that the officers were intimidating and verbally abusive throughout the incident.

Plaintiffs were brought to the police station in separate squad cars and placed in separate cells. ¶ 50. Mydung was handcuffed to a bench so tightly that her hands turned purple. ¶ 54. Mydung wanted to use the bathroom, but was told that in order to do so, she had to remove her jewelry. She initially decided against using the bathroom because she did not want to take off her jewelry, but as time passed the urge grew so powerful that she was forced to urinate on the floor of her cell, still handcuffed to the bench, and in full view of a security camera. ¶¶ 53, 55-56. Linh was denied the ability to make a phone call for approximately an hour. ¶ 52. None of the Plaintiffs were told why they were being arrested or read their Miranda rights. ¶ 51. At 1:40 a.m., after approximately four and a half hours in detention, Plaintiffs were released. ¶ 57.

Plaintiffs allege that the harassment, sometimes with police involvement, continued after the arrest. On September 18, 2008, two police officers allegedly came to Plaintiffs' house, inspecting and taking pictures of it, which frightened Plaintiffs' mother inside. ¶ 58. On October 1, 2008, following a complaint by one of the Defendant Lessors, three Countryside police

4

officers issued a citation to Lee Nails for theft of water. ¶ 61. This citation was later dismissed. ¶ 62. Beginning on October 15, 2008, the salon allegedly started experiencing harassment from unidentified men, who at various times shined car headlights into the salon (¶ 63), entered the salon and asked "What time is it?" before entering Little Joe's (¶¶ 64, 68), and intimidated Danny Nguyen (¶ 74). Meanwhile, Sam Beccara began loitering in front of the salon and harassing customers (¶¶ 65-66), and allegedly ordered an unknown man to approach Danny and "get" him and Linh. ¶¶ 69-71. Plaintiffs called the police, who filed an incident report but did not come to the scene. ¶ 71. Angela Beccara approached a Lee Nails customer in the parking lot, turning around when the customer started to take a cell phone photo (¶ 67), and later took pictures of other Lee Nails customers. Plaintiffs allege that one night the Countryside Police called to inform them that the back door to the salon was unlocked and open, despite Plaintiffs' certainty that they had locked it. ¶ 72. The door was later found to be securely locked. *Id*. The Countryside Police reported to Linh that the basis for their information was a call from Angela Beccara. ¶ 73. Plaintiffs later received a lecture from the Fire Marshal that they characterize as harassing (¶ 75), and were told by Countryside Police to stop taking pictures because it was making Cumbo nervous (¶ 76).

This state of affairs eventually became untenable for Plaintiffs, and they moved out sometime before November 12, 2009, although they continued paying rent. ¶ 78. Plaintiffs allege that soon after Plaintiffs moved out, Defendant Lessors changed the locks on the property, unplugged Plaintiff's surveillance equipment inside (which the police refused to investigate, calling the incident a "civil matter"), took down signs directing customers to the salon's new location, and stored their personal property inside the empty space in violation of the lease agreement. ¶¶ 78-82.

Plaintiffs' complaint alleges a battery of claims against Defendant Lessors, the City of Countryside, and Defendant Officers. Defendant Officers and the City of Countryside are charged with seven violations of 42 U.S.C. § 1983: Excessive Force (Count I), Unlawful Detention (Count II), False Arrest (Count III), Deliberate Indifference to Medical Needs of a Pretrial Detainee (Count IV), Civil Conspiracy (Count V), and Failure to Intervene (Count VII). Defendant Officers and the City are also charged with state law Malicious Prosecution (Count VIII). Defendant Lessors are accused of a civil conspiracy under Illinois state law (Count VI), Intentional Infliction of Emotional Distress (Count X), Private Nuisance (Count XII), Intrusion Upon Seclusion (Count XIII), Tortious Interference with Prospective Economic Advantage (Count XIV) and Breach of Contract (against Cumbo alone) (Count XI). Finally, Plaintiffs assert a claim for indemnification against the City of Countryside under 42 U.S.C. § 1983 (Count IX).

The only basis for federal jurisdiction for the claims asserted against Defendant Lessors is supplemental jurisdiction. 28 U.S.C. § 1367(a). Defendant Lessors contend that Plaintiffs' federal claims against the City and the Defendant Officers under 42 U.S.C. § 1983 are insufficiently related to the state law claims against them for supplemental federal jurisdiction to lie under 28 U.S.C. § 1367(a), and accordingly move this Court to dismiss Counts VI, X, XI, XII, XIII, and XIV pursuant to Federal Rule of Civil Procedure 12(b)(1).

**II.    Legal Standard**

Federal courts are courts of limited jurisdiction; "they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Transit Express, Inc. v. Ettinger,* 246 F.3d 1018, 1023 (7th Cir. 2001). Furthermore, 28 U.S.C. § 1331 provides that "[t]he district courts shall have original jurisdiction of all civil

actions arising under the Constitution, laws, or treaties of the United States." The burden of establishing jurisdiction lies with Plaintiffs. *Transit Express*, 246 F.3d at 1023. Under Rule 12(b)(1), a party may move to dismiss a claim (or, indeed, an entire lawsuit) on the ground that the Court lacks subject matter jurisdiction. In evaluating a motion brought pursuant to Rule 12(b)(1), the Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the plaintiff. *Long v. Shorebank Dev. Corp.,* 182 F.3d 548, 554 (7th Cir. 1999).

Where a plaintiff pleads both federal and state law claims, supplemental jurisdiction is appropriate over the state law claims where the state law issues "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). The "case or controversy" requirement is satisfied when the state and federal claims "derive from a common nucleus of operative facts." *Sanchez & Daniels v. Koresko*, 503 F.3d 610, 614 (7th Cir. 2007); see also *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725 (1966). "A loose factual connection between the claims is generally sufficient." *Id.* (quoting *Baer v. First Options of Chicago, Inc.,* 72 F.3d 1294, 1299 (7th Cir. 1995) and *Ammerman v. Sween,* 54 F.3d 423, 424 (7th Cir. 1995)). However, it is not enough that the claims be tangentially related. *Hernandez v. Dart*, 635 F.Supp. 2d 798, 814 (N.D. Ill. 2009) (citing *Chaney v. City of Chicago.,* 901 F.Supp. 266, 270 (N.D. Ill. 1995)). Furthermore, the "facts linking state to federal claims must be 'operative,' *i.e.*, they must be 'relevant to the resolution of' the federal claims." *U.S. v. Clark*, 2010 WL 476637, *1 (N.D. Ill. Feb. 3, 2010) (citing *Berg v. BCS Financial Corp.,* 372 F. Supp. 2d 1080, 1093 (N.D. Ill. 2005)); see also *General Auto Serv. Station v. The City of Chicago,* 2004 WL 442636, *12 (N.D. Ill. Mar. 9, 2004) (state law claim that provided "factual background" for

federal constitutional claim was not sufficiently related to give rise to supplemental jurisdiction). While "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties," a district court may exercise its jurisdiction when "judicial economy, convenience and fairness to litigants" so demands. *Gibbs*, 383 U.S. at 726. If a plaintiff's claims are "such that he would ordinarily be expected to try them all in one judicial proceeding," exercise of federal jurisdiction is appropriate. *Id.* at 725. A district court should also retain jurisdiction over supplemental claims when "substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort." *Wright v. Assoc. Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994).

### III. Analysis

The allegations in the complaint, viewed in the light most favorable to Plaintiffs, paint a picture of months-long harassment committed by the Defendant Lessors in violation of state law. The complaint also clearly alleges a number of federal constitutional violations committed by the Defendant Officers on the evening of September 15 and into the following morning. The question before the Court is whether the state and federal claims are "so related" to each other "that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

As noted above, Defendant Officers and the City of Countryside are charged with seven violations of 42 U.S.C. § 1983: Excessive Force (Count I), Unlawful Detention (Count II), False Arrest (Count III), Deliberate Indifference to Medical Needs of a Pretrial Detainee (Count IV), Civil Conspiracy (Count V), and Failure to Intervene (Count VII). Each of these counts arises solely out of the acts or omissions taken by the Defendant Officers on the night of September 15, 2008 and into the following morning. The excessive force claim (Count I) concerns the amount

of force that the Defendant Officers used when they arrested Plaintiffs at the salon and Count VII charges that other of the arresting officers failed to intervene to prevent the use of excessive force. Counts II and III allege that Danny was falsely arrested and detained without probable cause. Count IV involves the police's refusal to provide Mydung with a bathroom at the station and their failure to treat her bruised wrists and hands. Count V, civil conspiracy, alleges that the arresting officers "entered into a tacit agreement amongst themselves and other unknown officers to deprive the Plaintiffs of their constitutional rights" at the time of the arrest. Fourth Am. Cmplt. at 23.

Conversely, Plaintiffs' claims against Cumbo and the Beccaras are entirely state law claims. They seek redress for the alleged harassment, Cumbo's breach of the lease agreement, and the civil conspiracy to enact those wrongs. The wrongs allegedly committed by the Defendant Lessors occurred over a span of many months.

The Court concludes that the two sets of claims are not sufficiently related such that "they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Critically, none of the state claims shares the same or similar elements of proof as any of the federal claims—the sets of claims involve different "evidentiary and legal burden[s]." *Clark*, 2010 WL 476637 at *1; see also *White v. Addante*, 498 F. Supp. 2d 1109, 1112 (N.D. Ill. 2007) (federal and state claim did not share common nucleus of operative facts because they did not share common elements of proof); *Prudential-Bache Secs., Inc. v. Lisle Axis Assoc.,* 657 F. Supp. 190, 195 (N.D. Ill. 1987) ("'[o]perative fact,' as the term itself demonstrates, is a proof-oriented concept."); *Salei v. Boardwalk Regency Corp.,* 913 F. Supp. 993, 998-99 (E.D. Mich. 1996) (noting that plaintiff's state and federal law claims all arose from defendant's efforts to collect a debt and that when "viewed from this broad perspective" the

9

claims shared a common set of facts, but finding no supplemental jurisdiction because "upon closer inspection, it is apparent that [p]laintiff's state and federal claims do not share any of the same 'operative facts * * * the facts that are relevant to the resolution of [the federal claim] are completely separate and distinct from the facts that bear on [p]laintiff's state claims"). For example, in order for Plaintiffs to succeed on their breach of contract claim against Cumbo, Plaintiffs must plead and prove four elements: '(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages.'" *Reger Development, LLC v. National City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (quoting *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 1st Dist. 2004)). The proof required to succeed on such a theory does not overlap in any way with any of elements of the claims against the Defendant Officers. Whether Cumbo breached the terms of the lease is unrelated to the level of force the Defendant Officers used during Danny's arrest. Granted, the two sets of claims do share a common backdrop—the long-running landlord tenant dispute in some sense culminated in the events of September 15, 2008. However the claims share no "operative facts"—that is, facts relevant to the disposition of the claims. *Clark*, 2010 WL 476637 at *1; *General Auto Serv. Station*, 2004 WL 442636 at *12.

In Plaintiffs' response brief, Plaintiffs attempt to connect the claims against the Defendant Lessors and the claims against the Defendant Officers by arguing that the "Defendant Officers engaged in a civil conspiracy under § 1983 that involves Cumbo and the Beccaras that led to repeated harassment, abuse, and intimidation of the Plaintiffs by the officers including the arrest of the Plaintiffs on September 15, 2009 [sic]." (Pl. Resp. at 2). Plaintiffs' complaint contains some similar allegations. See Cmplt. ¶ 43 ("Officer Stern and Officer Muszynski responded to the call and based on information and belief conspired with the Beccaras to commit false arrest

later that evening."); ¶ 87 ("There is a close nexus between the actions and events involving Defendants Cumbo, the Beccaras, and the Defendant Officers * * * because the former Defendants repeatedly used the latter Defendants as their "agents" to harass and intimidate the Plaintiffs."). On Pages 3 to 4 of their response brief, Plaintiff lists instances in which the officers allegedly assisted the Defendant Lessors, for example, by escorting Cumbo as she delivered a notice regarding repairs needed at the salon or by telling the Nguyens in August of 2007 that they "would be arrested" if they did not settle the ongoing dispute with their landlord.

As an initial matter, Count V (which is the Count that actually charges the Defendant Officers with civil conspiracy) alleges only that they conspired "amongst themselves and other unknown officers"—not with the Defendant Lessors. Fourth Am. Cmplt. at pg. 23.[2] But even if that defect could be corrected through repleading, the central problem would not disappear. Even if the Defendant Officers are alleged to have been somehow involved in the harassment of Plaintiffs by their landlords, none of the claims against the Defendant Officers stems from such involvement. Instead, all of the claims against the Defendant Officers arise solely from their conduct during Plaintiffs' arrest and subsequent detention. Whether Defendant Officer Stern in fact told the Nguyens in August of 2007 that they "would be arrested" if they did not settle the ongoing dispute with their landlord is simply irrelevant to the claims that actually are being asserted against Officer Stern—all of which stem from his alleged conduct on September 15 and 16, 2008. Plaintiffs do not allege that the Defendant Lessors and the Defendant Officers conspired together, for example, to ensure that excessive force was used against Plaintiffs or to ensure that Mydung would be denied access to a bathroom once at the station. While the Defendant Lessors may have placed the call that led to Plaintiffs' arrest, Plaintiffs do not allege

---

[2] Plaintiffs have asserted a separate state law conspiracy claim (Count VI) against Defendant Lessors.

that the actual *mistreatment* was at Defendant Lessors' instigation. See *Grooms v. Tencza*, 2010 WL 1489983, *3 (N.D. Ill. April 13, 2010) (unsupported allegation of a "conspiracy" to connect two arrests insufficient to link claims "to create a common nucleus of operatives facts so as to permit all of these claims to proceed in one lawsuit").[3] In sum, the two sets of claims are analytically distinct. In fact, they are different cases.[4]

Furthermore, the interests of "judicial economy, convenience and fairness to litigants" do not demand that both sets of claims be tried together in federal court. *Gibbs*, 383 U.S. at 726. Since, as explained above, the evidence required to prove the two sets of claims is materially distinct, Plaintiffs will suffer no inconvenience, prejudice, or even duplication of effort trying the state claims in state court. As the lawsuit is still in its early stages, the Court has not committed "substantial judicial resources" to the state claims such that dismissal will cause a substantial duplication of effort." *Wright*, 29 F.3d at 1251. Furthermore, it should be clear from the foregoing discussion that the "correct disposition" of the state law claims is not "so clear as a matter of state law that it could be determined without further trial proceedings and without

---

[3] Similarly, Plaintiffs argue that their IIED claim against Cumbo and the Beccaras "arise[s] out of the events on September 15, 2009 [sic]" and thus forms part of the same case or controversy as the claims against the officers. (Pl. Resp. at 4). But the IIED claims against the Defendant Lessors will turn on the outrageousness of *their* conduct, not conduct committed by the Defendant Officers. The elements of intentional infliction of emotional distress are: (1) extreme and outrageous conduct of defendant; (2) defendant knew, or should have known, that the conduct would inflict severe emotional distress; and (3) defendant's conduct did cause extreme emotional distress. *Feltmeier v. Feltmeier,* 798 N.E.2d 75, 79-80 (Ill. 2003). The evidence involved in proving the elements of the tort will involve, for example, the outrageousness of Sam's 9-1-1 call to report a woman with a lighter, not the outrageousness of what happened to Plaintiffs once the police arrived.

[4] Defendant Lessors additionally ask that Counts VI (Civil Conspiracy) and X (Intentional Infliction of Emotional Distress) be dismissed *with prejudice* under Rule 12(b)(1) to the extent that these claims stem from the arrest of Plaintiffs on September 15, 2008. While the Court will dismiss these counts, it does not see why the dismissals should be with prejudice, nor have Defendant Lessors offered support for that proposition.

entanglement with any difficult issues of state law" that considerations of judicial economy warrant retention and decision rather than relinquishment of the case to the state court. *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1182 (7th Cir. 1993). To the contrary, correct disposition of the litany of claims against the Defendant Lessors will likely involve months of discovery, briefing, and potentially trial before they are resolved.

## IV. Conclusion

For the foregoing reasons, the Court concludes that Plaintiffs' state law claims against Defendant Lessors do not share the same operative facts as Plaintiffs' § 1983 claims against the other Defendants. Accordingly, the claims against the Defendant Lessors (Counts VI, X, XI, XII, XIII, and XIV of Plaintiffs' Fourth Amended Complaint [37]) do not lie within this Court's supplement jurisdiction and must be dismissed without prejudice pursuant to Federal Rule of Civil Procedure 12(b)(1).[5]

Dated: November 23, 2010 _____

Robert M. Dow, Jr.

United States District Judge

---

[5] Pursuant to 735 ILCS 5/13-217, Plaintiffs have the greater of one year or the remainder of the applicable limitations period to refile these claims in an Illinois court.